**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LONDON DIVISION**
**ACTION NO.** _____

**[ELECTRONICALLY FILED]**

**TRISTAN JAMES HALL**                                                **PLAINTIFF**
2112 Shaker Run Road
Lexington, KY 40509

VS**.**

**CITY OF WILLIAMSBURG, KENTUCKY**
423 Main Street, Williamsburg, Kentucky 40769

       Serve:  Roddy Harrison, Mayor
             423 Main Street
             Williamsburg, KY 40769

             Roddy Harrison, Mayor
             210 Main Street
             Williamsburg, KY 40769

             Kim Frost, City Attorney
             201 Main Street
             Williamsburg, KY 40769

**and**

**WAYNE BIRD, CHIEF OF POLICE**
**FOR THE CITY OF WILLIAMSBURG, KENTUCKY**
Individually and in his Official Capacity

       Serve:  Wayne Bird
             423 Main Street
             Williamsburg, KY 40769
**and**

**ALLEN TRIMBLE, COMMONWEALTH**
**ATTORNEY FOR WHITLEY COUNTY, KENTUCKY**
Individually and in his Official Capacity

1

Serve:  Allen Trimble
323 Main Street
P.O. Drawer 430
Williamsburg, KY 40769

Allen Trimble
28 Man O War Trail
Corbin, KY 40701

**and**

**ROBERT HAMMONS, WHITLEY COUNTY ATTORNEY**
Individually and in his Official Capacity

Serve:  Robert Hammons
218 N Main Street
Corbin, KY 40701-1452

**and**

**JACKIE STEELE, COMMONWEALTH ATTORNEY
FOR LAUREL COUNTY**
Individually and in his Official Capacity

Serve:  Jackie Steele
128 North Main Street
London, KY 40741

**and**

**RICHARD "RICHIE" BAXTER, OFFICER FOR THE KENTUCKY
STATE POLICE, POST 11 LONDON, KENTUCKY**
Individually and in his Official Capacity

Serve:  Richard "Richie" Baxter
Kentucky State Police Post 11
11 State Police Road
London, KY 40741

Richard "Richie" Baxter
3011 Sunset Drive
Corbin, KY 40701

**and**

2

**USAA CASUALTY INSURANCE COMPANY**
9800 Fredericksburg Road
San Antonio, Texas 78288

> **Serve:** CT Corporation Systems
> Registered Agent for Process
> 306 W. Main Street, Suite 512
> Frankfort, KY 40601

**and**

**USAA GENERAL INDEMNITY COMPANY**
9800 Fredericksburg Road
San Antonio, Texas 78288

> **Serve:** CT Corporation Systems
> Registered Agent for Process
> 306 W. Main Street, Suite 512
> Frankfort, KY 40601

**and**

**VERACITY RESEARCH COMPANY**
111 Dallas Street
Argyle, Texas 76226

> **Serve:** National Registered Agents, Inc.
> Registered Agent for Process
> 306 W. Main Street, Ste. 512
> Frankfort, KY 40601

**and**

**JAMES POTTER WILDER, JR**
5709 Azalea Lane
Louisville, KY 40258

> **Serve:** James Potter Wilder, Jr.
> 5709 Azalea Lane
> Louisville, KY 40258

$\hspace{10cm}$ **DEFENDANTS**

*** *** ***

3

## COMPLAINT AND JURY DEMAND

Comes the Plaintiff, Tristan James Hall (hereinafter sometimes "Hall" or "Plaintiff"), by his undersigned counsel Hal D. Friedman and Michael T. Cooper and the law firm of COOPER & FRIEDMAN, PLLC, and for his causes of action against the above named Defendants states as follows:

## I.  INTRODUCTION

From May 13, 2013 to date the Defendants, individually, together or in concert, without probable cause, caused and continue to cause Hall to be falsely charged with numerous crimes or offenses, and hence to be maliciously prosecuted for those crimes, thereby depriving him of his constitutional rights including his right to liberty and personal integrity, all as further detailed below. Hall brings this lawsuit to recover from the Defendants for all harms and damages caused to him and which he has incurred and suffered, and to exonerate his good name and reputation, under 42 U.S.C. §1983 for unconscionable and gross, malicious, and/or reckless violations of the rights, privileges and immunities guaranteed him by the Fourth and Fourteenth Amendments to the Constitution of the United States (as well as any and all other applicable provisions or amendments), and further for associated state law torts, as set forth below. This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983. Supplemental jurisdiction over Hall's pendent state law claims exists pursuant to 28 U.S.C. § 1367(a). Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Eastern District of Kentucky, London Division, as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. Venue is also

4

proper as, upon information and belief the majority of the Defendants reside or work within Whitley County, Kentucky.

## II.    THE PARTIES

1.    Plaintiff Hall was at all times material to this Complaint a citizen and resident of the Commonwealth of Kentucky, Whitley County. He currently resides in Lexington, Kentucky at the above address.

2.    Defendant City of Williamsburg ("City of Williamsburg") is a City of the fourth class, pursuant to KRS 81.010, and is sued herein in its official capacity as an official entity and subdivision or municipality of the government. Neither the City nor its officers are entitled to immunity at law. The City and its officers and employees were at all times acting under the color of state law.  Upon information and belief, the City of Williamsburg through its Chief as the chief policy maker for the City's police force lacked a coherent policy or practice of supervising or training its police, investigative officers and other officials in connection with their law enforcement duties or practices, which resulted in whole or in part in the damages and harms suffered by Hall as alleged herein.

3.    Defendant Allen Trimble ("Trimble") was at all times relevant to this Complaint the duly appointed and acting Commonwealth Attorney for Whitely County, Kentucky acting under color of law in his official and individual capacities within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the County and/or the Commonwealth of Kentucky. He is sued herein in his individual and official capacities. Trimble was one of the primary investigators and/or prosecutors who pursued Hall for one or more of the false charges identified below and

5

conspired with other Defendants or other individuals to prosecute Hall, in an unlawful and malicious manner, for crimes which no reasonable prosecutor would pursue and where no probable cause exited for the charges filed or for the continuation of criminal or judicial proceedings against Hall, all so as to deprive him of those rights, privileges and immunities including his personal liberty and integrity, secured to him by the United States Constitution as alleged further herein below. Upon information and belief Trimble may have also conspired with others to cause Hall physical pain and suffering all in furtherance of his scheme to deprive Hall of his rights secured under the Constitution and/or to try to force him to plea to one or more crimes for which he was not guilty, as alleged further herein below.

4.      Defendant Wayne Bird ("Bird") was and is at all times relevant to this Complaint the Chief of Police for the City of Williamsburg, acting under the color of law in his individual capacity and within the scope of his employment and duties as an officer pursuant to the statutes, ordinances, policies, customs, and usage of the City, Whitely County, Kentucky and/or the Commonwealth of Kentucky. Bird is sued herein in his individual and official capacities. Bird was charged, in part by Trimble and potentially others, to investigate one or more crimes alleged against the Plaintiff and in doing so violated federal and state laws and/or acted in conspiracy with Trimble or others to maliciously prosecute Hall and to deprive him of those rights, privileges and immunities secured to him by the United States Constitution, including his rights to personal liberty and integrity, as alleged further herein below.

5.      Defendant Robert Hammons ("Hammons) was at all times relevant to this Complaint the duly appointed and acting County Attorney for Whitely County, acting

6

under the color of law within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the County and/or the Commonwealth of Kentucky. He is sued herein in his individual and official capacities. Hammons was one of the primary investigators and/or prosecutors who pursued Hall for one or more of the false charges identified below and conspired with other Defendants to prosecute Hall, in an unlawful and malicious manner, for crimes no reasonable prosecutor would pursue and where no probable cause existed for the charges filed or the continuation of criminal or judicial proceedings against Hall, all so as to deprive him of those rights, privileges and immunities including his personal liberty and personal integrity, secured to him by the United States Constitution, as alleged further herein below.

6.      Defendant Jackie Steele ("Steele") was at all times relevant to this Complaint the duly appointed and acting Commonwealth Attorney for Laurel County, Kentucky acting under the color of law in his official and individual capacities within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the County and/or the Commonwealth of Kentucky. Steele is sued herein in his individual and official capacities. Steele was one of the primary investigators and/or prosecutors who pursued Hall for one or more of the false charges identified below and conspired with other Defendants to prosecute Hall, in an unlawful and malicious manner, for crimes no reasonable prosecutor would pursue and where no probable cause existed for the charges filed or the continuation of criminal or judicial proceedings against Hall, all so as to deprive him of those rights, privileges and immunities including his personal liberty and personal integrity, secured to him by the United States Constitution as alleged further herein below.

7. Defendant Richard "Richie" Baxter ("Baxter") was at all times relevant to this Complaint a duly appointed and acting police officer or investigator with the Kentucky State Police, acting under the color of law in his individual and official capacities within the scope of his employment pursuant to the statutes, ordinances, policies, customs, and usage of the Commonwealth of Kentucky. Baxter was charged, in part by Trimble or others, to investigate one or more of the false charges outlined and set forth below. Upon information and belief Baxter was one of the primary investigating officers who pursued Hall at the direction of one or more of the other Defendants for one or more of the false charges identified below and/or conspired with other Defendants to prosecute Hall, in an unlawful and malicious manner, for crimes no reasonable officer would pursue and where no probable cause existed for the charges filed or the continuation of criminal or judicial proceedings against Hall, all so as to deprive him of those rights, privileges and immunities, including his personal liberty and personal integrity, secured to him by the United States Constitution, as alleged further herein below.

8. USAA Casualty Insurance Company and USAA General Indemnity Company (together "USAA") are foreign insurance companies, operating in the Commonwealth of Kentucky pursuant to the authority of the Commonwealth of Kentucky Department of Insurance and have been assigned DOI Numbers 300995 and 3001131 respectively. Upon information and belief USAA at one time insured a fur coat belonging to Hall which was believed to have been lost by Hall's former fiancé, Angela Reeves ("Reeves"), resulting in an insurance claim which precipitated the False Insurance Charge against Hall, as further outlined and alleged below.

8

9.      Defendant Veracity Research Company ("Veracity") is a Texas Corporation with its principal place of business being in Argyle, Texas, but which has applied for active status to do business in the Commonwealth of Kentucky and has been assigned Kentucky Organization Number 0638483 by the Kentucky Secretary of State. Upon information and belief Veracity was retained or contracted with USAA to investigate the circumstances concerning the missing fur coat more further described below. In so doing Veracity, for itself and on behalf of USAA retained or contracted with Defendant James Potter Wilder ("Wilder") for those investigative purposes, as further alleged below. Upon information and belief neither Veracity or USAA conducted a due and sufficient background check on Wilder and/or failed to properly train him and/or supervise him prior to authorizing him to investigate Hall on their behalf, resulting in one or more fabricated and false charges being filed and pursued against Hall, to his damage, including his false imprisonment and those other damages set forth below.

10.      Defendant Wilder is an individual resident of Kentucky, and an investigator who was at all times relevant to this Complaint employed by Veracity, which in turn was hired by USAA to conduct the investigation of Hall relative to the insurance claim on the fur coat identified in the allegations below. Upon information and belief, as alleged further below, Wilder is responsible in part for the false prosecution of Hall in connection with the lost fur coat insurance claim, and acted in a negligent, malicious, fraudulent, oppressive or reckless manner which resulted in false charges being levied against Hall, to his damage, including his false imprisonment and those other damages set forth below.

11.     The City of Williamsburg, Bird, Trimble, Baxter, Hammons, Steele, and Whitely County together with their officers and employees acting under color of state law are hereinafter sometimes collectively referred to as the "Municipal Defendants" or sometimes the "Municipal Defendants" as the context may require.

12.     At all times the Municipal Defendants acted through their employees, agents, officers, and public servants within the course and scope of their duties on behalf of each municipality or Municipal Defendant, and all acted under color of state law in carrying out those duties.

13.     Veracity, USAA and Wilder are sometimes hereinafter referred to as the "Private Defendants".

14.     At all times relevant to this Complaint all of the Private Defendants herein acted by and through their authorized officers, employees or agents within the course and scope of their respective duties, including but not necessarily limited to Wilder's investigation and illegal conduct in relation to his work for USAA and/or Veracity.

15.     All of the allegations above are restated and incorporated into each and every factual assertion, allegation or averment set forth below in the remainder of this Complaint.

### III.     THE FALSE "MURDER" AND "SOLICITATION CHARGE"

16.     Plaintiff restates and reasserts all of the factual allegations and averments set forth above.

17.     On or about January 10, 2013 an unknown individual using the pseudonym "Serious as a Heart Attack" posted on an internet site, www.topix.com/forum/city/corbin (the "Topix Site"), that they would "pay someone

10

$5000 cash for the murder and concealment of Melissa Jones body . . ." (the "Topix Post").

18.     At the time the Topix Post was made, Hall was in Church Hill, Tennessee visiting his father.

19.     On or about January 14 of the same year, Kentucky State Police Trooper Jay Sowders ("Sowders") sent a search warrant to Topix seeking the identity of the internet service provider and the internet address from which the Topix Post originated, to which Topix formally responded on or about March 25, 2013 identifying Time Warner as the internet service provider and the originating IP address as 72.51.170.235 (the "IP Address").

20.     On or about May 3, 2013 Sowders submitted a subpoena to Time Warner requesting the subscriber information for the IP Address.

21.     On May 7, 2013 Time Warner identified Hall as the subscriber to the IP Address.

22.     The IP Address was an "open" network or address, available for use by anyone within range or connective access to the open network. The notice from Time Warner Cable of May 7, 2013 specifically informed the authorities, therefore, that Time Warner could make no "representations as to the identity of the individual who actually used the IP address on the date and time in question." In other words, the Whitely County and other governmental authorities (including one or more of the Municipal Defendants) were on notice as early as May 7, 2013 that the mere identification of Hall as the subscriber to the IP address at issue was insufficient to identify the actual individual responsible for the Topix Post.

23.     On May 13, 2013 the Topix Post investigation was transferred to Kentucky State Police Post 11 and assigned to Baxter. During his short and inadequate investigation Baxter learned that Hall had legally obtained a concealed carry permit following completion of his classroom instruction on June 28, 2012 as required by KRS 237.110.

24.     Upon information and belief, obtained after inquiry, in conducting his investigation Baxter somehow concluded that the putative victim of the Topix Post was a Melissa Jones (whose maiden name was Melissa Davis (hereinafter "Davis")). Record checks verify that there was more than one "Melissa Jones" in or near the Whitely County, Kentucky geographic area. Baxter never spoke with Davis or any of the other Melissa Jones' residing in or near the County, nor did he investigate any other possible suspects other than Hall in connection with the Topix Post. Had he done so he would have learned that Hall had no connection to, or any relationship with Davis; but that Reeves, who lived with Hall in his apartment at the time and who had access to his IP address had a violent history with Davis which culminated in an altercation between them on November 26, 2011, at which time emergency services was called and a CAD report made by the Corbin Police.

25.     There was no probable cause or sufficient evidence suggesting that Hall created the Topix Post or was involved with it in any way. Regardless, without conducting a due and sufficient investigation, including inquiring of other individuals who might have had access to the IP Address, or who might have had cause to create the Topix Post, and despite the fact that there was never any identification of a "solicitee" or confirmation that the Topix Post was even related to Davis, Trimble nonetheless on May

12

15, 2013 instructed Baxter to obtain an arrest warrant charging Hall with the crime of "murder" under KRS 507.020. No reasonable prosecutor with only this limited information would have acted in the same or similar manner.

26.     The charge of "murder" was based solely on the Topix Post which, as averred above, Baxter had unilaterally concluded was related to Davis. Davis was alive at all times on May 15 2013 the date Trimble made the decision to have Baxter arrest Hall. Thus, as had to have been known to both Trimble and Baxter there was never any suggestion or suspicion, much less evidence that the Topix Post resulted in the unlawful killing of a human being or that any death resulted there from.  Therefore, at no time did Trimble, Baxter or any other municipal agent or employee acting at their direction under color of law have the legal or factual grounds, or probable cause, to charge Hall with murder.

27.     After learning of the murder charge Hall returned from Tennessee and voluntarily turned himself in to the authorities. Hall was arrested by Defendant Baxter on or about May 16, 2013 and taken into custody and remanded to the Whitely County Detention Center ("WCDC") in Williamsburg, Kentucky.

28.     The public community news media, including WLKY television and others, immediately published and reported Hall's arrest for "murder".

29.     The following day, May 17, 2013 Hall was arraigned for "murder" in Whitely County, Case No. 13-F-63 (the "Murder Case"), and his bond request was denied as he was declared a "danger to the public."  That same day, an unknown individual posted on Topix under the pseudonym "Oh yes" that "I guess the wedding is off … LOL . . ." Hall's then upcoming wedding to Reeves, which was to occur on May 25, 2013, had

never been publically announced which suggests the only person who could have made the second post on Topix was Reeves or someone else in her family or someone at her direction.  The authorities failed to even consider this information or investigate it in relation to the charges asserted against Hall.

30.     On May 21, 2013, Hall was taken before the Whitely District Court for a preliminary hearing at which bail was requested by Hall's then attorney Warren Scoville ("Scoville"). Scoville also informed the Court that the "murder" charge was incorrect as there was no allegation that anyone had been killed in connection with the Topix Post. The Court set bail in the amount of $1,000,000.00. Upon information and belief the bond was set at this excessive amount following an *ex parte* request by Trimble to Whitely District Judge Cathy Prewitt. During that hearing, Defendant Baxter gave false testimony, informing the Court that the putative victim, "Davis", took the Topix post as a serious threat, even though he had never spoken to Davis and even though the Topix Post related to a "Melissa Jones," a common name in the community.  This testimony was also in contradiction to information obtained during officer Sowders' investigation. The Court, on the basis of this and other testimony, issued an order binding the case against Hall over to the grand jury.

31.     On June 17, 2013 Hall was taken before the Whitely Circuit Court and presented with indictment No. 13-CR-163, amending the "murder" charge to "solicitation to commit murder" (the "Solicitation Charge"). The Solicitation Charge filed by Trimble was entirely unsupported by probable cause or applicable law because, among other things (1) solicitation to commit murder, being an inchoate crime, is controlled by KRS 506.030 and not KRS 507.020; and, (2) at no time prior to or after filing the Solicitation

Charge did Trimble or anyone acting at his direction or on behalf of any of the Municipal Defendants ever identify a "solicitee" or "another person" who Hall was alleged to have "commanded or encouraged" to commit an illegal act, as required by the statute and applicable law. Therefore, as a matter of law, Trimble never had legal grounds or probable cause to file or maintain the Solicitation Charge against Hall.

32.    On that same day, June 17, 2013 Hall's bond was reduced to $75,000.00 fully secured. He was released to home incarceration on June 18, 2013 after posting bond.

33.    Trimble and Baxter thereafter took control of the "investigation" related to the Solicitation Charge. In doing so, their investigation failed to investigate other potential suspects such as Davis' former business partners Jane Broyles or Robert Stafford. Baxter, acting at Trimble's direction, utterly failed to use the available evidence or proper investigative techniques to explore the origin of the Topix Post or to try to identify the actual individual who posted it, or identify any motive for its posting, nor did they consider the open nature of the computer network at issue prior to filing the charge against Hall and/or determining to maintain and pursue it. They and other officers and officials under their command or direction further bungled the investigation by failing to consider Reeves as a suspect even though, as set forth above, she had access to Hall's IP address at the time the Topix Post was created and she had a violent history with Davis, the putative victim of the Topix Post.

34.    Instead, in a rush to judgment based on what appears to have been a bias against Hall and his family, as will be detailed below and further in discovery, or under apparent pressure from others to demonstrate immediate progress in the investigation of

15

Case: 6:16-cv-00304-DCR-HAI Doc #: 1 Filed: 12/28/16 Page: 16 of 65 - Page ID#: 16

the alleged crime, the Defendants arbitrarily and without probable cause and without good faith or justifiable basis fixated on Hall, who was at the time an honor student with a 3.6 GPA at Eastern Kentucky University and who had, prior to being falsely accused of a heinous crime, intended to pursue a career in the law. In fact, Hall had taken the LSAT in August, 2012 and received letters of recommendation to law school from Judge Eugene Siler, Jr. from the United States Court of Appeals for the Sixth Circuit, and two Whitely County judges.

35.     Once the initial murder charge was amended to the Solicitation Charge, the grand jury indicted Hall in part on the basis of testimony by Defendant Baxter during the grand jury proceedings that Hall had a "concealed weapon permit", which he obtained lawfully and which therefore had no evidentiary value in connection with the Solicitation Charge. Further, this same testimony was used to set excessive bail in the Solicitation Charge in the amount of $1,000,000.00 cash. Trimble and Baxter's theory seems to have been that since Hall had access to a legally obtained weapon and a permit to use it, he had to be nefarious and thus had to be involved in the original Topix Post. No reasonable prosecutor or police officer could have come to or reached that conclusion, nor would any reasonable prosecutor present such information to the grand jury or the court in order to obtain indictment and gain excessive bail.

36.     It further appears that the Solicitation Charge was trumped up based on tailored or doctored police reports and records. For example, Trooper Jay Sowders, of KSP Harlan Post No. 10, one of the first investigating officers on the Solicitation Charge, first recorded in his investigation that Davis could not identify any possible suspects or anyone who might have created and posted the Topix Post. Later, after transfer to KSP

16

London Post No. 11, Baxter revised his report to state that the "only person" who would have written the Topix post was Hall, based on what appears to have been a "new and improved" statement by Davis which contradicted her first statement.

37.     During the period from Hall's indictment on the Solicitation Charge and all through the remainder of 2013, 2014 and 2015 neither Trimble, Baxter, or others in their command conducted any kind of reasonable or professional investigation into the origin of the Topix Post. Instead of seeking out or acquiring further evidence which would have supported probable cause for Hall's original arrest, or evidence which might have furthered the investigation or even exonerated Hall, for almost three years they merely allowed Hall to remain incarcerated (in the WCDC or on home incarceration) or otherwise in a perpetual state of uncertainty with conditions that illegally restricted his freedom without engaging in even basic police or prosecutorial investigative practices to move the Solicitation Charge forward in the Courts.

38.     During this same period, Trimble was married to Sherry Trimble, an expert on IP addresses and computer technologies of the kind at issue in the Solicitation Charge. Nonetheless, even when confronted with evidence by Hall that holding him and prosecuting him solely on the basis that his IP address was traced back to the Topix Post did not support probable cause for arrest, much less prosecution, Trimble continued to ignore those facts and proceeded to further the prosecution of Hall under the Solicitation Charge without evidence or information sufficient to justify probable cause for same.

39.     On or around April 15, 2014, Reeves inexplicably wrote a reference to Kentucky Rule of Professional Conduct 3.8(a) with window chalk on Trimble's office window.

40.     On April 23, 2014, Reeves delivered a news article regarding false arrests and open wi-fi, as well as a legal opinion stating "an allegation that an IP address is registered to an individual is not sufficient in and of itself to support a claim that the individual is guilty," to the home of Whitely Circuit Judge Paul Winchester ("Judge Winchester").

41.     On April 29, 2014, a hearing was held wherein the writing on Trimble's window and the documents delivered to Judge Winchester were placed of record. Soon after, those events were reported by local news.

42.     On May 3, 2014, Trimble filed a motion to revoke Hall's bond. All of the issues raised therein in support of the revocation motion were without merit (i.e. claiming a speeding ticket had violated bond). Further, Trimble was at that time fully aware of Rule 3.8(a) and the documents delivered to Judge Winchester supporting a conclusion that the Solicitation Charge was without probable cause.

43.     On June 4, 2014, Hall filed three motions in connection with the Solicitation Charge:

> (a)     A motion for bill of particulars, requesting "[t]he identity of 'another person' whom he was alleged to have solicited for murder, listed merely as 'someone' on the Solicitation Charge indictment;"

> (b)     A "motion to dismiss for defective indictment," arguing that the failure to identify a solicitee and failure to identify a victim, based on the "Melissa Jones" versus "Melissa Davis" discrepancy, rendered the charge defective; and;

(c)    A "motion to dismiss for lack of jurisdiction," arguing insufficient evidence to support the indictment (i.e. no recordings, confessions, eyewitnesses, devices seized, or solicitee) as the Commonwealth was unable to meet its burden of proving Hall was even within the jurisdiction when the Topix Post occurred.

44.    On June 16, 2014, during a pretrial conference, Trimble was again put on notice that the Solicitation Charge was without probable cause, as Hall's motions illustrated. However, he chose to wrongly maintain and pursue the charge, but again took no action to further investigate the Solicitation Charge.

45.    On February 2, 2015, Special Circuit Judge Samuel Spalding ("Judge Spalding") was designated to preside over the Solicitation Charge.

46.    On April 22, 2015, Hall's new criminal defense attorney, Herbert Moncier ("Moncier") filed motions to compel the bill of particulars and for exculpatory evidence relating to the Solicitation Charge. Steele, who by that time had been appointed to pursue the charge, never responded.

47.    Thereafter, it appears once again that none of the Municipal Defendants took any further steps to investigate the Solicitation Charge, or to establish the existence of probable cause either to charge Hall, continue to charge him or to continue to prosecute him.

48.    In February, 2016 after holding and prosecuting Hall for almost three years, without conducting any further substantive investigation into the grounds for the Solicitation Charge, the Commonwealth voluntarily dismissed the Solicitation Charge, citing insufficient "witnesses or evidence" to prosecute the case, and further conceded

that the Commonwealth did not have probable cause to believe that Hall was responsible for the Topix Post. Nothing changed in those three years. This makes it abundantly clear that the Commonwealth never had, from the start, sufficient "witnesses or evidence" to charge or prosecute Hall on the Solicitation Charge, much less incarcerate or confine him for all of that time.

49.     The Court granted the Commonwealth's motion to dismiss the Solicitation Charge with prejudice, by Order of February 11, 2016.   During that hearing the prosecutor conceded that nothing was going to change in terms of the evidence the Commonwealth had, or ever could acquire, in connection with the charge.

50.     As a result of the false Murder and then Solicitation Charge, and thence the other additional maliciously conceived bogus charges later fabricated and pursued by the Defendants against Hall in an effort to pressure Hall to accept a plea deal or stipulate to probable cause on the Solicitation Charge or for other nefarious purposes (each additional bogus charge being identified and described in detail below), Hall spent approximately 570 days in jail or under house arrest, while he sought to exonerate himself.

51.     As a result of the above described conduct, as well as the conduct alleged below, Hall spent hundreds of thousands of dollars on court proceedings, incarceration fees and lawyers, all to his damage.

52.     As a result of the above described conduct, as well as the conduct of the Defendants as alleged below, Hall lost income and the ability to generate future income as an attorney, something he had dreamed about for years and pursued prior to the assertion of the false Murder and later Solicitation Charge.

53.     As a result of the above described conduct, and the conduct set forth and alleged below, Hall was subjected to malicious prosecution, was confined against his will, falsely imprisoned and suffered severe physical and mental and emotional injuries as a result thereof.

54.     Eventually, as with the Murder and Solicitation Charges, all of the additional false charges identified below, and filed by Trimble or others at his behest, with the sole exception of the "hindering charge" (described below) were dismissed by the Commonwealth, either for lack of probable cause or lack of evidence. Hall has never stipulated to probable cause those charges and has fought for his reputation and innocence in each case.

## IV.     THE SUBSEQUENT BOGUS CHARGES

### A.     Retaliation Against and Intimidation of a Witness

55.     Hall restates and reasserts all of the above allegations as if fully set forth herein.

56.     Some months prior to his arrest and incarceration on the Murder and/or Solicitation Charge, while an honor student at Eastern Kentucky University with a 3.6 GPA, Hall was admitted to the University of Dayton Law School.

57.     Subsequently, in May, 2014, while still under charge and confinement as to the Solicitation Charge, someone contacted or brought to the attention of the Dayton Law School that in making application therefore, Hall had not disclosed his prior arrest history. His only prior arrest history related to the false Murder and Solicitation Charge. As a result, Dayton Law School rescinded his admission on or about May 2, 2014. Hall suspected at that time that Trimble made the call and brought the Solicitation Charge to

21

the law school's attention.

58.     Approximately two weeks later, on May 16, 2014, Reeves called and contacted Trimble to report that Hall was considering a bar complaint against Trimble based on his belief that Trimble made improper contact with the University of Dayton Law School and had informed the school of his prior arrest record, which lead to the school's rescission of its offer of admission to Hall.

59.     Trimble responded to Reeves during that phone call in part as follows: "[y]ou tell him to go right ahead and do that" and, in the same phone call on that date mentioned the University of Dayton by name, even though Reeves never mentioned the law school Hall had applied and been accepted to. Therefore, it seems probable that Trimble already learned about Hall's acceptance by the Dayton Law School from some other source, on an earlier date.

60.     The reasonable inference is that as Hall suspected, due to his bias against Hall, Trimble uncovered the information himself and then made contact with the law school to inform it of Hall's charges, in an effort to sabotage Hall's acceptance and thus his future career as a lawyer.

61.     About a month later, on June 11, 2014, Reeves contacted Trimble and advised in a message left on voice mail that "[t]he rumor . . . is your goanna let Hall off the [Solicitation Charge] and if you do not find him guilty I will deliver his dead head to your lobby with blood all over it. You better find him guilty."

62.     A few days later, on June 23, 2014 Hall finalized a bar complaint against Trimble, based on what he reasonably had cause to believe was Trimble's interference with his law school acceptance, as set forth above.

22

63.    Elsewhere that day, Reeves contacted Trimble inquiring into one of his investigator's notes. Trimble stated in that conversation to Reeves "all I can tell you is that your getting really close to being in a lot of trouble and I would advise you to kind of stay out of this."

64.    The very next day, on June 24, 2014, while on continuing house arrest in relation to the Solicitation Charge and while confined at his Grandmother's home, Hall was arrested by Bird on new charges, initiated by Trimble for "intimidation of a legal participant" (later indicted as "retaliation against a legal participant") stemming from the phone calls made by Reeves and her voice message of June 11, 2014. The intimidation of a legal participant and retaliation against legal participant charges (Case Nos. 13-CR-29 and 14-F-225) are hereinafter referred to collectively as the "Retaliation and Intimidation Charges". On that same day Bird served a search warrant of Hall's residence and seized numerous items as set forth below. At the same time, he sought to serve and did serve an arrest warrant for Reeves, also on the charge of intimidating a participant in a legal proceeding.

65.    The warrant filed by Bird in Whitley County Kentucky in connection with the Retaliation and Intimidation Charges falsely alleged that between June 5, 2014 to June 11, 2014, Hall together with "his girlfriend Angie Reeves AKA Angie Hall placed 8 different phone calls to Trimble" stating threats as a means of intimidating Trimble in relation to Hall's Solicitation Case, in violation of KRS 524.040.

66.    The accompanying uniform citation listed Trimble as the "witness" to the events, even though at the time he was the Commonwealth Attorney and prosecutor on the Solicitation Charge as well as on the new charges for Retaliation and Intimidation

filed June 24, 2014. This created a clear conflict of interest for Trimble.

67.     The information provided by Bird in Hall's arrest warrant for the intimidation of a witness charge was false. Hall never made any calls to Trimble at any point during the applicable time line. In fact, Reeves made all of the calls to Trimble, and those calls contained no threat against Trimble as contemplated by KRS 524.010(8). The only threat made by Reeves was against Hall as set forth above. Further, Trimble was not a participant or a witness in the Solicitation Charge. Therefore, KRS 524.040 was inapplicable as the underlying facts did not support the new charges and there was never any probable cause for same to be brought against Hall.

68.     It is clear that the intention on the part of Bird and Trimble in filing and pursuing the new charges for Intimidation and Retaliation was to intimidate and pressure Hall to sign a plea deal or stipulate to probable cause for his initial arrest and prosecution relative to the Murder and/or Solicitation Charge, as well as to sway public opinion against Hall.

69.     In sum, at the time of his arrest for the Intimidation and Retaliation Charges the Commonwealth had no evidence linking Hall to any intimidation or retaliatory conduct, let alone any phone calls or any threats to or against anyone, including Trimble. Hall had no contact with Trimble or any legal participant in the Solicitation Case at any point in time prior to his arrest on those new, fabricated charges. Further, Trimble had a clear conflict of interest as both the Commonwealth Attorney and as a putative witness relative to those charges.

70.     As mentioned previously, in connection with Hall's arrest on the Intimidation Charge Trimble had Bird execute a search warrant of Hall's grandmother's

24

home, on June 20, 2014, where he was then residing on house arrest related to the Solicitation Charge. The warrant authorized the search and seizure of Hall's vehicles, person, computers, as well as all phone records and phones or other devices in Hall's home, among other things.

71. In executing the search warrant the City of Williamsburg and Bird seized Hall's phone, Reeves' phone and an assortment of other items including computers, an iPad, and receipts. However, at the same time, the government also improperly seized attorney client privileged records and work product prepared and exchanged between Hall and attorney Scoville. Further, although the warrant was issued on June 24, 2014, in connection with what Bird and Trimble alleged were intimidating phone calls, at no time thereafter did Trimble or Bird send the phones collected during the search warrant to the crime lab for examination or testing. This is confirmed by the Evidence/Chain of Custody ledger identifying the items recovered from Hall and those that were actually sent to the crime lab. This suggests that the authorities knew Hall never made any calls to Trimble and the phones had no evidentiary value.

72. Trimble's abuse of his office and power as well as his conflict of interest pursuant to KRS 15.733 (which required him to disqualify himself in connection with the Intimidation charge) is further demonstrated by his decision to subpoena records pertaining to Hall and, on or about June 25, 2014, to petition the Court to set aside the original bond Hall was required to post in the Solicitation case, on the basis that Hall had been "arrested and charged with Intimidating a Participant in the Legal Process while on bond" even though he knew there was no probable cause to support such a charge.

25

73.    As with the original "murder" and "solicitation" charges the new charges against Hall were picked up by the community news media which reported that "Hall and Reeves are accused of leaving threatening messages on the prosecutor's voice mail." Thereafter, Trimble falsely told WKYT, in violation of Kentucky Supreme Court Rule 3.130 – 3.8(e) that the messages suggested things "he" (referencing to Hall) was going to do to Trimble because of "my involvement and participation in the case" even though Trimble had no evidence that Hall made any such calls and even though the threats were directed at Hall, not Trimble.

74.    Subsequently, Hall was held without bond between June 25, 2014 and August 29, 2014 at the WCDC on the Intimidation and Retaliation Charges. While Trimble did eventually move for recusal he did not request a special prosecutor be assigned until August 21, 2014, which was clearly an unreasonable delay resulting in Hall being confined longer than necessary on charges which Trimble knew or should have known his office had no probable cause to pursue.

75.    On August 25, 2014, Special Commonwealth Attorney Steel was assigned to prosecute the Intimidation and Retaliation Charge, upon Trimble's notice to the Kentucky Attorney General. Trimble specifically requested Steele, and admitted to having already spoken with him about the case prior to his appointment.

76.    On August 29th, 2014 pursuant to an Order entered by the Hon. Henry Johnson, the Intimidation Charge was dismissed due to the Commonwealth's failure to properly or timely indict Hall on the "intimidation of legal participant" charge within the requisite 60 days. However, the charges were later revived and Hall was indicted on the Retaliation Charge.

77.    Subsequent investigation reveals that Trimble's motive for his malicious prosecution of Hall may have stemmed, at least in part, from the fact that Trimble had learned, in his own words on the date Hall was arraigned "the identity of [Hall's] Grandmother" whom Trimble had "met" years before during his prosecution of her other grandsons, who Trimble believed were "perpetually before the court for various crimes." Trimble confirmed his knowledge of Hall as "grannie's favorite" in a letter he wrote to Scoville on September 4, 2014. His motive also appears to have been the bar complaint Hall had pursued against Trimble, in as much as there was clearly never any basis for the new charge.

76.    By September 24, 2014 it had become indisputable that Defendants Trimble, Bird and Steele knew it was Reeves, and only Reeves, who had made the calls at issue and which resulted in the Intimidation and Retaliation Charges against Hall. This is because Reeves confessed to Bird in an interview on that date.

77.    Nonetheless, the Commonwealth, through Steele proceeded to seek indictment against Hall on the Retaliation Charge even though they knew or should have known that only Reeves had made the calls which formed the basis of those charges. At the same time, they refrained for unknown reasons from charging Reeves with that same crime. In fact, at no point in time thereafter did the Commonwealth ever charge Reeves in connection with the alleged intimidating phone calls even though they had a confession from her that she was the one who made the calls and that Hall was not involved.

78.    On October 2, 2014, Hall replaced Scoville with Moncier as lead counsel.

79.    Beginning October 2, 2014, Steele would not agree to a date to hear Hall's motions for bail and Judge Johnson refused a hearing without Steele's participation,

resulting in Hall's continued incarceration.

80.     On February 2, 2015, Bird, at the direction of Trimble and/or Steele, gave false and perjured testimony before the Grand Jury. When asked by a grand jury member if the phone message left in Trimble's office had been confirmed to be the accused [Hall], Bird's response was "Yes," which was clearly false and a knowing lie given that Reeves had already confirmed for Bird in her September 24, 2014 interview that she was solely responsible for the calls and voice messages to Trimble. In addition, Bird knew the voice message was in actuality a threat against Hall, not Trimble, a fact which was never disclosed to the grand jury which was mislead into believing that the threat was against Trimble.

81.     On March 2, 2015, while incarcerated at the WCDC, on the basis of this false and perjured testimony by Bird, the Grand Jury returned a one count indictment against Hall under KRS 524.055 for Retaliation Against a Participant in the Legal Process (i.e., Trimble) by "engaging in or threatening to engage in conduct causing or intending to cause bodily injury in or damage to the property of Allen Trimble, a participant in a legal process."

82.     On April 4, 2015, attorney Moncier filed a motion for a bill of particulars relating to the Retaliating Charge. Steele never responded to that Motion.

83.     On May 14, 2015, Attorney Leroy Gilbert, Hall, and Forensic Investigator Jason Woods met with Bird and recovered the items seized during the June 24, 2014 search of Hall's grandmother's house. Upon doing so, Bird presented what he declared was "the master log" chain of custody to Attorney Gilbert; however, that document contained less entries than the same document provided in discovery months before, so

28

that the seized property appeared to have never left the possession of the WPD. An actual "master log" with final entries showing the return of property from the crime lab to the WPD has never been provided. Oddly enough, Steele had not supplied the crime lab report in discovery, and only did so when attorney Moncier later moved to compel. This was presumably because the report detailed the improper examination by the authorities of privileged attorney-client files.

84.     During this time, Trimble, Steele and others continued to make offers, or suggestions to Hall and/or his lawyer that the matters at issue could be resolved or settled if Hall would make a deal with the Commonwealth. Hall refused, determined to demonstrate his innocence. All during this time, the Commonwealth refused to respond to bills of particular or to provide any evidence supportive of the charges pending against Hall. In fact, at no time did the Commonwealth ever produce a bill of particulars as to the Retaliation Charge even after ordered by the Court to do so.

85.     Finally, on February 11, 2016 the Commonwealth through Steele voluntarily sought dismissal of the Retaliation Charge (together with the Solicitation Charge, as set forth above), again conceding that Trimble and the Commonwealth never had probable cause to charge or continue the charge and could not successfully prosecute the charge of Retaliation Against a Participant in a Legal Proceeding as it had no evidence in support of same. Nothing had changed by February 11, 2016. The Commonwealth had the same "evidence" at that point that it did when it first determined to prosecute Hall on the Retaliation Charge. Clearly no reasonable prosecutor or official would have prosecuted Hall on the basis of the information they had in connection with that charge.

## B.    The Hindering Prosecution Charge

86.    During the pendency of the Solicitation Charge, as set forth above on June 24, 2014, Bird personally appeared at Hall's grandmother's home located at 424 Rains Street, Williamsburg, Kentucky. This was to execute a search warrant and an arrest warrant against Hall in connection with the Intimidation and Retaliation Charges.

87.    Hall's cousin, Jayce Brown, a juvenile, voluntarily opened the door to allow Bird access to the premises. Hall, checking to see who was at the door, walked down the hall to the front door at which time Bird immediately, without advising Hall of his Miranda rights, placed Hall under arrest for the Intimidation and Retaliation Charge(s) described hereinabove.

88.    After placing Hall in custody, despite not reading or providing him with his Miranda rights and prior to him advising Hall that he had a warrant for Reeve's arrest, Bird asked Hall the whereabouts of Reeves.

89.    Hall informed Bird at that time that he and Reeves had separated several months before. Bird then informed Hall that he also had with him an arrest warrant issued for Reeves for Intimidating a witness in a judicial proceeding (the same charge or charges leveled against Hall related to the phone calls made to Trimble as set forth above). Reeves was later found hiding in a closet on the premises.

90.    The next day, June 25, 2014, while incarcerated at WCDC for the Intimidation Charge, Hall was served with an additional arrest warrant for "Hindering Prosecution or Apprehension of a Witness" under KRS 520.130 (Case No. 14-M-357, hereinafter the "Hindering Charge") despite the fact that he was questioned while already under arrest, and without having been given his Miranda rights, in violation of his

constitutional rights under the applicable amendment(s) and despite the fact that he was not prior told by Bird that he had an arrest warrant for Reeves.

91.     On June 26, 2014, Hall's bail was set at a clearly excessive $250,000 cash on the Hindering Charge, even though the Hindering Charge was a misdemeanor. He was incarcerated in the WCDC and remained there until his Aunt was able to pay the excessive bail, on or about December 5, 2014.

92.     During his incarceration on the Hindering Charge on July 24, 2014, Hall filed a *pro se* Miranda Motion in which he informed the Court that he had not been properly arrested on the Hindering Charge, that he was not given his Miranda rights, and requested dismissal of the charge.

93.     In later presenting Grand Jury and other testimony on the charge Bird again provided multiple inconsistent statements to the grand jury members and the Court as to how Hall had come to be arrested for the Hindering Charge on June 24, 2014. For example, during his grand jury testimony on February 2, 2015, Bird told the Grand Jury that he executed the search warrant and then "arrested [Hall] immediately" on the Intimidation Charge.

94.     However, just three hours later at the suppression hearing in the same case on the same charge (Hindering) (which was brought pursuant to Hall's *pro se* motion to Dismiss) Bird tailored his testimony and told the Court that upon entering Hall's residence "I explained I had a search warrant and I asked where Angela Reeves was. He said I have not seen Angela in three to six months . . . at that time he was placed in cuffs."

95.    Bird gave similar conflicting and evidently false statements to the news media, and in recorded interviews, including the one with Reeves on September 24, 2014 which should have fully exonerated Hall on the Intimidation and Retaliation Charges, as set forth above.

96.    As the Hindering Charge (a misdemeanor) was pending before the Whitley County District Court, Hammons was appointed to prosecute that charge.

97.    Special District Judge Wendell "Skip" Hammons was assigned to preside over the Hindering Charge.

98.    On January 12, 2015, after several complaints by Attorney Moncier about the clerk of the court ignoring the court order releasing Hall after he posted bail, Hall was released to home incarceration.

99.    Again, as with the other charges, despite the new charge against Hall for "Hindering", County Attorney Hammons took no action to further the Hindering Charge or to move forward with any investigation on that charge for months. In fact, it was not until after February 2016, or roughly 18 months later (after the other charges against Hall were dismissed for lack of probable cause) that he commenced any efforts to move the Hindering Charge forward. Instead, during that period as with the other charges, Hammons sought to offer Hall various plead deals if he would merely stipulate to probable cause on one or more of the charges or plead guilty and accept diversion or other reduced penalties. Hall refused, determined to clear his name of all false charges.

100.    On October 25, 2016 during the rescheduled suppression hearing set by the District Court, the Court *sua sponte,* for no known reason and in violation of Hall's rights to due process as reflected by Criminal Rule of Procedure 4.4, Judge Hammons

32

added bond conditions to the Hindering Charge. Those new conditions included among other conditions that Hall have no contact with prosecutor Hammons. This made no sense in as much as the bond itself had already been discharged by the Circuit Court on September 10, 2015, so there was no "bond" to attach conditions to at that time.

101.    In the process of setting these new "bond conditions" the Court used its "white noise ability" to prevent a recording at the bench of the reasons the Court had determined to add the new bond conditions. This unusual step may have been taken at the bequest of Hammons, as reported in the news media, in an effort to avoid the conflicting testimony of Bird becoming public.

102.    Roughly 8 hours later, after the inclusion of the bond conditions, someone posing as Hall sent an email to prosecutor Hammons which stated, in pertinent part, that 'in lieu of today's hearing I have a request: keep the miscarriage out of it. That really bothers me; it does not have any relevance in any way. . . I would hope you are not shallow enough to use this against me. . . let's keep it civil."

103.    On October 28, 2016, on the basis of the email referenced above prosecutor Hammons moved for an order seeking to revoke Hall's bond on the Hindering Charge (even though none existed) and to hold Hall in contempt for alleged violation of the Court's new bond conditions established on October 25.

104.    The actual email allegedly sent to prosecutor Hammons has not been provided to Mr. Hall's criminal defense counsel despite request for examination so as to allow Hall to demonstrate that he did not originate the email.

105.    To the best of Hall's knowledge the Commonwealth has never established that the email came from Hall's IP address, let alone that he was the person who drafted

33

or sent the email upon which the Court assessed the contempt charge at the bequest of prosecutor Hammons.

106.    As a result of this new charge for contempt, Hall was threatened with spending another 180 days in jail, or to held indefinitely on a revoked bond, unless he plead to the Hindering Charge and confessed that he sent the email in question. This was despite the fact that Hall and his counsel prior served a notice of time to the Court and the prosecutor which established that Hall has already served time far beyond the statutory limits for which he could be sentenced on the Hindering Charge.

107.    Hall believes and avers that the new bond conditions and the subsequent email were a set up by prosecutor Hammons, Bird, Reeves or others working in conspiracy to manufacture an additional basis to either keep him incarcerated or to force him into a plea deal or otherwise stipulate to probable cause on the Hindering Charge.

108.    The Commonwealth never investigated who else might have sent the email to Hammons and clearly could not prove contempt beyond the reasonable doubt standard required at law. Nonetheless, it continued to apply pressure on Hall to enter into a plea, clearly in an effort to extricate itself and its law enforcement officials from the unconstitutional conduct above alleged over the course of over three years.

109.    On November 21, 2016 faced with the untenable prospect of being put back into the WKDC for up to 180 days on the trumped up contempt charge, or agreeing to a plea deal to avoid further incarceration, Hall agreed to plead to both the Hindering Charge and Contempt Charge. However, he specifically reserved his right to appeal those plea agreements. Both plea agreements were advanced by the authorities for improper and malicious purposes, to force Hall to agree to plea out or face an additional six months

34

in jail on the contempt charge. Faced with that impossible decision, Hall chose the only path available to him, to plea to the charges and avoid further jail time but only upon and subject to the agreement that he could appeal the plea agreement and, as he has with all other charges, demonstrate his innocence and the malicious prosecution and illegal conduct of the authorities.

110.    Shortly thereafter, Hall hired attorney Steven Romines of Louisville to file and prosecute the appeal on the plea deal entered November 21, 2016.

111.    However, before Mr. Romines could file the appeal, on November 29, 2016, Defendant Hammond filed a motion to set aside the plea deal on the grounds that he believed or determined, subsequent to his advance, acceptance and entry of the plea deal, that he could have been a "witness" in the proceeding and therefore would have been disqualified to act as prosecutor relative to the plea he negotiated and agreed to with Hall.

112.    The Motion to set aside the plea deal is without basis in law, and it is clear that the Motion was filed for some other malicious or nefarious purpose, likely because once Hammond knew the plea would be appealed he felt he had made a bad deal and believed he needed to unwind it, to Hall's detriment, again and in keeping with past prosecutorial misconduct.

113.    Further it appears Hammons violated the terms of the plea deal by contacting the media, including upon information and belief the News Journal, about the deal contrary to the specific terms thereof which prohibit the Commonwealth of Hall from discussing the deal with the media.

114.    The plea deal on the Hindering and Contempt Charges have since been

appealed and remain on appeal as of the filing of this Complaint.

C.       The Harassing Communications Charge

115.    According to Bird, Reeves, who had previously been charged with Intimidating Trimble (but was never indicted with Retaliation as Hall was) contacted Bird on January 26, 2015 to report that Hall, with intent to intimidate, harass, annoy or alarm her, contacted her by phone and texts or emails between January 19, 2015 and January 22, 2015.

116.    On the basis of these representations Bird instructed Reeves to visit prosecutor Hammons and obtain an arrest warrant. Hall was then charged and then arrested on a Complaint filed by Reeves under KRS 525.080 ("Harassing Communications Charge").

117.    Thereafter, Hall was held and confined for approximately 65 days without bond, despite the charge being a class B misdemeanor.

118.    On March 26, 2015 Hall was finally released on a writ of habeas corpus after posting a $10,000 bond.

119.    It seems clear enough again, as with the other charges, that the Harassing Communication Charge was maliciously asserted, and maintained, all in an effort to hold Hall and thus coerce him into making a confession, or entering into a plea or stipulating to probable cause on one or more of the charges leveled against him. Hall refused, just as he had with respect to all of the prior charges leveled against him.

120.    On March 21, 2016, more than a year after asserting the charge but without conducting any reasonable investigation in the interim, the Commonwealth of Kentucky through prosecutor Hammons suddenly determined that the "acts of the

36

complaining witness" (Reeves) were "inconsistent with her allegations against [Hall]". The Whitely District Court thereupon dismissed the Harassing Communication charge with prejudice, on that date, March 21, 2016.

### D.    The "Fraudulent Insurance Acts" Charge

121.    On March 2, 2015 while defending the other bogus charges identified above and while incarcerated at the WCDC, Indictment No. 15-CR-28 was served on Hall. This time, the arrest and indictment resulted from a charge, rendered by the Whitely County Grand Jury, that from April 9, 2013 (two years prior) through September 26, 2013 Hall committed the offense of "Fraudulent Insurance Acts over $500.00 by falsifying an insurance claim in order to obtain benefits from U.S.A.A. Casualty Company."

122.    On June 22, 2015 that charge was amended, this time asserting the same charge but on the basis that Hall "knowingly and with intent to defraud or deceive, prepared, presented or caused to be presented written and oral statements as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy knowing that the statement contained false, incomplete, or misleading information concerning any fact or thing material to a claim in violation of KRS 304.47-020(1)(a)" (the "Fraudulent Insurance Charge").

123.    The Fraudulent Insurance Charge arose from the loss by Reeves of a fur coat owned by Hall, which he had inherited from his deceased aunt.

124.    Subsequent to her loss of the coat, on April 9, 2013, Hall reported the loss, and an investigation was initiated by USAA.

125.    As part of its investigation into the lost coat, USAA contracted with Veracity which in turn hired Wilder as a private investigator to investigate the events surrounding the fur coat loss claim.

126.    Upon information and belief, obtained upon due inquiry, neither Veracity or USAA ever investigated the background of Wilder prior to retaining or employing him as an investigator. Had they done so, they would have learned that Wilder was terminated by several police departments or districts in Kentucky between approximately 1998 and 2005, including but not necessarily limited to the City of Shephardsville, Audubon Park, and Strathmoor Village in Louisville, Kentucky for violations of their respective rules and procedures, and due to complaints by citizens over his temper, harassment and abuse. In fact, Wilder had been sued by former Strathmoor Village resident Maria Arnold in the United States District Court, Western District of Kentucky, Case No. 3:04CV-649 for (a) false arrest, (b) malicious prosecution, (c) battery, and (d) intentional infliction of emotional distress; and (2) Wilder's former employer Strathmoor was also sued in that same action for negligent hiring of Wilder. The jury in that case awarded Ms. Arnold the sum of $1,000,000.

127.    On the morning of April 19, 2013, roughly 10 days after the reported loss, Reeves notified Wilder that the fur coat had been found the day before. Although Wilder knew the fur coat had been found, later that day Wilder traveled to Hall's residence and conducted an interview with Reeves about the incident. On April 23, 2013 he provided a report on the loss of the fur coat and his communications with Reeves (the "Wilder Report").

38

128.    On June 6, 2013, USAA notated their records that "law enforcement is considering filing charges against [Reeves] for this claim; and "per legal . . . [t]here is insufficient evidence of misrepresentation by [Hall]." Subsequently, the claim was closed.

129.    However, on June 12, 2013, despite the conclusions reached by their own legal department, USAA sent a copy of the claim file to the National Insurance Crime Bureau and initiated (at least in part) the Fraudulent Insurance Charge against Hall.

130.    At the time of presentation of the Fraudulent Insurance Charge to the grand jury of Whitely County, on information and belief, Wilder's tape recording of his conversation with Reeves was not available to the Kentucky officials involved in the case. Therefore, the Commonwealth presented the testimony of Mike Hagan, of the Kentucky Department of Insurance, to the grand jury, regarding the investigation by Wilder and the interview of Reeves based upon Wilder's notes, which lead to Hall's indictment on the Fraudulent Insurance Charge.

131.    Subsequently, Hall obtained the recordings in question. A comparison of the tape recordings to the written summaries that were before the prosecutor at the time of the grand jury investigation lead to significant questions regarding the accuracy of the summaries relied upon by the prosecutors and the grand jury in asserting the charge, and suggest that the Wilder Report was falsified.  Wilder's notes, for example, stated Hall had interrupted the interview several times as Reeves tried to admit to fraud; however, Hall's security video and Wilder's recording showed Hall had interrupted only once to get coffee. Most notable, however, Wilder's recording revealed Reeves had not confessed to fraud as he claimed. It is important to note that USAA had both Wilder's report and the

contrasting interview within its possession the entire time.

132.    Further, it was known or should have been known to the Whitely County authorities that Wilder was an extremely unreliable witness, having been sued many times and having been forced out of several police departments because of his temper, harassment, and abuse. In fact, as set forth above in October, 2013 a Louisville woman secured a $1,000,000 jury award against Wilder for this type of conduct and for fraudulent conduct similar to what it appears he did in connection with his investigation into Hall's insurance claim.

133.    During the July 1, 2015 pretrial conference for the Fraudulent Insurance Charge, Reeves who was called to testify, admitted to being coached by Hagan and twice invoked her right to self incrimination.

134.    Regardless of this, the Commonwealth acting through Steele maintained the False Insurance Charge against Hall. No reasonable prosecutor would have done the same.

135.    During this time, the Commonwealth through Steele, continued to offer Hall plea deals or suggest resolution of the Fraudulent Insurance Charge and/or the other bogus charges if Hall would plea to one or more charges, or stipulate to probable cause thereon. Hall refused, determined to demonstrate his innocence of and as to all charges and to exonerate himself and his name.

136.    On September 10, 2015, Judge Spalding ordered the modification of Hall's bond thereby releasing him from home incarceration and removing all conditions. As of that time Hall had spent a cumulative total of 570 days either in custody at the WCDC or on home incarceration in connection with the above specified charges,

individually or in combination.

137.    Subsequently, on November 10, 2015, Hall filed a petition to Steele to dismiss the Fraudulent Insurance Charge, arguing that the Fraudulent Insurance Charge was not supported by probable cause, in violation of SCR 3.130(3.8) and other applicable law.

138.    Two days later, the Commonwealth dismissed the Fraudulent Insurance Charge on the basis of what it called "serious reservations regarding the trustworthiness of Ms. Reeves. . ." In sum, there never was probable cause to charge Hall with the Fraudulent Insurance Charge or to continue to prosecute him.

## V.    ADDITIONAL ALLEGATIONS AGAINST ALL DEFENDANTS

139.    As of October 26, 2016 Hall has been fully exonerated of all of the above specified charges, except the Hindering charge, which grew out of the false Intimidation Charge.  He was never brought to trial and all charges against him for which he served time at the WCDC or was otherwise home incarcerated were voluntarily dismissed with prejudice by the Commonwealth due to lack of evidence and/or lack of probable cause. Hall spent 570 days total (in relation to all charges) in jail and/or on home incarceration for crimes he did not commit, and for crimes that no reasonable prosecutor would have asserted or maintained and which the investigating officers knew or should have known did not warrant their involvement in assisting with the prosecution thereof.

140.    The pervasive, systemic and unconstitutional official and private misconduct of Defendants that led to Hall's wrongful arrests, prosecutions, and detainment did not occur in isolation, outside of official bureaucratic channels. Rather, the actors who deprived Hall of his constitutional protections under the fourteenth and

fourth amendments to the United States Constitution (and any other applicable amendments) and caused him to be wrongly arrested, prosecuted, and imprisoned were acting with the direct participation, knowledge, and/or acquiescence of supervisors and policymakers in Whitely County, Kentucky, the City of Williamsburg and the Kentucky State Police and their officials and officers pursuant to the customs, policies, patterns, and/or practices of those entities and the misconduct and egregious failures of training, supervision, and oversight within those Municipal entities or agencies.

141. In addition to those facts set forth above, it appears that Hall's former counsel, Scoville, either worked directly with the authorities in violation of his oath to maintain client confidences, or participated in the scheme by Whitely County, the City of Williamsburg, Trimble, Bird and others to insure that Hall remained in jail or was otherwise wrongfully convicted of one or more of the above charges.

142. During a conversation Scoville had with Moncier on October 2, 2014, roughly 18 months prior to the final dismissal of all charges against Hall (other than the Hindering Charge), Scoville (who had learned that Hall was considering filing a bar complaint against him) affirmatively stated to Moncier that "if that boy files a bar complaint against me I'll make damn sure a jury convicts him."

143. Scoville appears to have sought to do just that. Upon information and belief, Scoville had "back channel" conversations with or was cooperating with the Williamsburg Police Department (including Bird) to protect Reeves, at the expense of his former client Hall.

144. Unfortunately, after addressing and placing under seal the affidavits of Moncier and Hall on May 4, 2015, which contained such serious allegations against

Scoville, he committed suicide, on May 7, 2015.

145.    Additionally, it appears that in furtherance of his scheme and malicious efforts to keep Hall in jail for crimes he knew Hall did not commit, Trimble enlisted the assistance of a jail "snitch" and inmate named Brandon Petrey ("Petrey").

146.    On October 26, 2014, while Hall was incarcerated in the WCDC, he was brutally and savagely beaten by Petrey with a dining tray while sleeping.  The assault was unprovoked and witnessed by three WCDC guards. The assault resulted in Hall being diagnosed with a concussion and contusion at Baptist Health hospital in Corbin, Kentucky.

147.    Petrey, a career criminal who was facing charges ranging from criminal mischief to attempted murder (as was known to Trimble), bragged about his assault on Hall and expressed in an open comment in front of Hall and others at WCDC that he was going to get "rewarded" for his assault on Hall.

148.    Subsequently, just a week or so later on November 3, 2014, Petrey, who knew Trimble for years as he had worked for him at his home, was suddenly provided a plea bargain on all charges pending against him in Kentucky which authorized his prison sentence "to run concurrent with [his] Tennessee sentence." In sum, although he was facing a total of perhaps as much as years in prison before his assault on Hall, after the assault Trimble's proffered deal allowed Petrey to be released in six (6) months, on June 23, 2015.

149.    Trimble's involvement in this conspiracy is evident upon review of the video-taped hearing from December 1, 2014, in which he affirmatively approaches the judge following the plea deal orchestrated for Petrey by Trimble. In the video, upon being

43

brought from the holding cell into the courtroom, Petrey bypasses his attorney and walks directly to Trimble where they engage in inaudible conversation. Then at the end of the hearing, Trimble can be seen and heard saying that Petrey (a career criminal who once cut off someone's arm) is "not a bad kid" and deserves "extra points" (or a reward), undoubtedly for his attack on Hall at the behest of Trimble. Thereafter, Petrey was sentenced via the proffered plea agreement and granted furlough during transfer back to Tennessee, in what appears to have been a violation of Kentucky Department of Corrections Policy 9.4.

150.    Notwithstanding the absence of any evidence linking Hall to the crimes and charges identified above, and strong evidence exculpating him as early as 2013, the police and other Municipal Defendants continued to target him as a suspect as to each and every one of the bogus charges, all of which (other than the Hindering Charge and the Contempt Charge) were eventually dismissed on the basis of lack of evidence or probable cause. The Hindering Charge and the Contempt Charge, which were as set forth above also trumped up to try to force Hall to choose between a plea deal or an additional six months in jail, are currently on appeal.

151.    To that end, Defendants made a concerted effort to conceal or dismantle or avoid discovering evidence of Hall's innocence while using pressure, public statements, inducements and lies to create evidence of his guilt or to obtain a confession, plea or agreement from him so as to avoid potential, subsequent civil liability for their outrageous and unconstitutional conduct.

152.    Trimble, Hammons and Steele violated their duties and obligations to properly prosecute on the basis of probable cause. Rather, they sought to persecute Hall

and clearly were not interested in seeing that truth and right should prevail in Hall's situation. Those Municipal Defendants had a duty to protect Hall's rights, as well as those of the Commonwealth but maliciously abandoned that duty for their own personal reasons. Baxter and/or Bird participated in the illegal investigation and prosecution of Hall as to each of the bogus charges while knowing that no reasonable law enforcement official would have prosecuted Hall on any of those charges.

153.    Long before March 2016, Trimble, Bird and other law enforcement officials and investigators had a clearly established constitutional duty to disclose exculpatory and impeachment information in connection with Hall's constitutional right to a fair trial pursuant to *Brady* v *Maryland, Giglio* v. *United States,* and its progeny. Failing to carry out these *Brady* disclosure duties posed obvious risks for Hall, yet the Municipal Defendants utterly failed to train in this regard or honor their duties. Specifically, the Municipal Defendants did nothing to ensure that anyone involved understood their *Brady* duties and carried them out in practice.

154.    As a direct result of the Municipal Defendants' intentional or deliberate indifference to the obvious risk their *Brady* violations posed to Hall and other innocent suspects of other crimes and charges, the confusion persisted throughout the period covered by this Complaint without intervention from supervisors or policymakers.

155.    For example, pursuant to this unconstitutional custom and practice of suppressing helpful information and utterly failing to train anyone in their *Brady* duties, the defendants working for the City of Williamsburg, Whitely County and/or the Kentucky State Police maliciously prosecuted and covered up or withheld exculpatory and impeachment information — including evidence of their own misconduct — from

45

innocent suspect Hall, who was wrongly charged five (5) or more separate times for crimes he did not commit and for which he endured 570 days of imprisonment or confinement before the bogus and false charges lodged against him were dismissed.

156.    Even today without justification or probable cause the Municipal Defendants continue to maliciously prosecute Hall on the "Hindering Charge" and on the basis of the alleged and clearly trumped up "contempt" charge as set forth above, and to impose unreasonable and clearly unconstitutional punishment upon Hall in connection with those bogus charges in what is an obvious effort to break Hall, or to force him to cease his defense of those charges so as to avoid any potential for further incarceration.

157.    It is a well-established legal principle and a fundamental tenet of responsible police practices that fabricating evidence or suborning perjury and other similar practices to manufacture probable cause to arrest, detain, or prosecute a suspect violates the suspect's constitutional rights. Nonetheless, the Municipal Defendants themselves or by and through agents affirmatively engaged in such practices, while their supervisors failed either to properly train or supervise their prosecutors, investigators or detectives to ensure they did not engage in such conduct, or to discipline them when they did. These failures created an environment of impunity in which fabricating evidence and maintaining the prosecution of charges without sufficient probable cause was tacitly authorized.

158.    These systemic lapses and unconstitutional actions were the norm in Whitely County and the City of Williamsburg and/or at the Kentucky State Police during the period covered by this Compliant, and before and thereafter and continue to this day.

## VI.    DAMAGES

159.    Plaintiff incorporates by reference each and every allegation set forth above as if fully restated herein.

160.    The actions of the Defendants, individually and collectively, deprived plaintiff Hall of his civil rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and other applicable sections or amendments thereof, and under the laws of the Commonwealth of Kentucky including the Kentucky Constitution.

161.    This action seeks damages for the period from January 10, 2013 to present and into the future.

162.    The unlawful, intentional, willful, deliberately indifferent, reckless, negligent, and/or bad-faith acts and omissions of the Defendants caused Hall to be wrongly seized, falsely arrested, indicted without probable cause, maliciously prosecuted without probable cause, subjected to illegal searches, beatings and emotional and mental suffering as well as cruel and unusual punishment during the period of time covered by this Compliant, all for crimes he did not commit.

163.    The unlawful, intentional, willful, deliberately indifferent, reckless, negligent, and/or bad-faith acts and omissions of the Defendants caused Hall the following injuries and damages, which were foreseeable to the Defendants at the time of their acts and omissions, and which continue to date and will continue into the future: physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of educational opportunity; loss of professional opportunity; loss of past and future income (impairment to labor and earn

money); expenditure for attorney fees necessary to defend the bogus charges and/or costs to post bond, and attorney fees in the future which may be necessarily incurred to continue to defend the Hindering and/or Contempt Charges; hedonic damages; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; loss of religious freedom; denial of a speedy trial as required by the Constitutional authorities; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, medical care, medical expenses in the past and in the future, loss of privacy, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for all of which he is entitled monetary relief.

164.    All of the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, with deliberate indifference, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.\

## VII.    FEDERAL CONSTITUTIONAL CLAIMS

## COUNT I

### 42 U.S.C. § 1983 CLAIM FOR MALICIOUS PROSECUTION FOR VIOLATIONS OF THE 4th AND 14th AMENDMENTS

165.    Hall hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

166.    The Municipal Defendants, acting with malice, took steps to initiate and continue the prosecution of Hall without probable cause or arguable probable cause to believe he was responsible for one or more of the crimes identified aforesaid.

48

167.    In furtherance of the malicious prosecution, said Defendants disregarded and dismantled credible alibi evidence, suppressed exculpatory evidence, intentionally delayed proceedings resulting in loss of available witnesses and evidence, fabricated evidence, fabricated and pressured inculpatory witness statements, failed to conduct an adequate investigation of the crimes by pursuing leads pointing to other leads or suspects, and covered up impeachment evidence of their own misconduct.

168.    The lack of even arguable probable cause was obvious to the Municipal Defendants. Those Defendants knew that the physical, testimonial and other evidence exonerated Hall from all of the bogus charges filed against him long before they sought dismissal thereof. Yet, said Defendants disregarded all the evidence pointing to Hall's innocence and chose to prosecute him anyway.

169.    No reasonable prosecutor, police officer or investigator or other governmental official would believe the evidence adduced in connection with the above bogus charges could provide probable cause or even arguable probable cause to arrest, indict or prosecute, or justified the implementation of excessive bail and confinement under false pretenses as demonstrated above.

170.    Yet, acting with malice, the Municipal Defendants covered up the truth about their own misconduct, or avoided focusing on exculpatory evidence and conspired to secure and maintain Hall's confinement, hoping for an eventual plea deal which would exculpate them from civil penalties, all the while knowing that the truth would have eviscerated probable cause and would have had to have resulted in abandonment of the prosecution of Hall.

171.    In fact, Hall was at all times innocent of all crimes for which he was

acquitted, and maintains his innocence in connection with the Hindering Charge and the Contempt Charge.

172.    Municipal Defendants' actions to deprive Hall of his liberty without probable cause were in violation of clearly established constitutional law under the Fourth and Fourteenth Amendments, and no reasonable prosecutor, investigator or police officer in 2013, or after, would have believed that their actions were lawful.

173.    The Municipal Defendants' actions directly and proximately caused Hall's arrests, indictments, malicious prosecution, and deprivation of liberty during his three-year ordeal, as well as all the ongoing injuries and damages set forth above.

**COUNT II**

**42 U.S.C.  § 1983 CLAIM FOR DEPRIVATION OF LIBERTY
BY FABRICATING FALSE EVIDENCE OR
WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT
EVIDENCE, AND FAILING TO INVESTIGATE, IN VIOLATION OF THE 14TH
AMENDMENT OF THE US CONSTITUTION**

174.     Hall hereby incorporates and references all of the foregoing paragraphs and further alleges as follows:

175.    The Municipal Defendants deprived Hall of liberty without due process of law, by deliberately fabricating evidence that was used to arrest, indict, prosecute and convict him.

176.    Specifically, among other illegal conduct as set forth above, one or more of the Municipal Defendants gave false or perjured testimony to one or more grand juries on one or more of the charges leveled against Hall, as outlined above, and tailored their testimony in order to effect indictment and further prosecution of Hall on trumped up charges. Defendants also sought to obtain coerced confessions or pleas from Hall. They

further failed to investigate obvious errors or problems with their charges against Hall, including for example their failure to inquire into the open nature of the internet website that was used to post the Topix Post, and ignored the admonition from Time Warner that the IP address confirmation could not serve to identify the person who created the Topix Post.

177.    No reasonable officer would have believed this conduct was lawful.

178.    Defendants' fabrications and other dastardly behavior directly and proximately caused Hall's improper arrests, and deprivation of liberty without due process of law during his three-year ordeal, as all the ongoing injuries and damages set forth above.

179.    Defendants also failed or refused to disclose exculpatory evidence, including for example the information from Time Warner above described and Angela Reeve's confessions that she made the phone calls to Trimble which resulted in the Retaliation Charge, among other evidence. By failing to disclose this information, defendants violated the Fourteenth Amendment, as interpreted by *Brady* v. *Maryland,* 373 U.S. 83 (1963), *Giglio* v. *United Scales,* 405 U.S. 150 (1972), *California* v. *Trombetra,* 467 U.S. 479 (1984), *Arizona* v. *Youngblood,* 488 U.S. 51 (1988), and their pre-1993 progeny, which imposed a clear constitutional duty on the Municipal Defendants not to conceal or suppress exculpatory evidence, and rather to document and report exculpatory and impeachment information.

180.    The exculpatory and impeachment information these Defendants concealed, suppressed and destroyed in this case was material, and undermined confidence in the outcome of the charges asserted against Hall.

181.    The Municipal Defendants' deliberate and intentional concealment, suppression and/or destruction of exculpatory and impeachment information directly and proximately caused Hall's deprivation of liberty without due process of law during his three years of confinement, as well as all the ongoing injuries and damages set forth above.

182.    The Municipal Defendants further violated Hall's Fourteenth Amendment rights by intentionally, recklessly and with deliberate indifference failed to conduct a constitutionally adequate investigation of the crimes with which he was charged to seek out the true perpetrator, to wit, by:

a.    failing to send evidence to the lab before or after charges were filed;

b.    failing to indentify other potential suspects, including Reeves, as possible perpetrators of one or more of the charges, in particular the Solicitation Charge;

c.    intentionally not interviewing alibi witnesses who might have tended to disprove Hall's guilt and prove his innocence;

d.    failing to follow up on exculpatory and potentially exculpatory information provided by Hall and/or witnesses who were interviewed in connection with the charges; and,

e.    instead, coercing, fabricating and manufacturing evidence of Hall's guilt by means of covering up exculpatory witness statements, using undue suggestion to induce the grand jury or grand juries to charge and indict Hall.

183.    Defendants' acts and omissions in failing to conduct a reasonable investigation seeking to determine the truth about crimes asserted against Hall violated Hall's clearly established rights under the procedural due process component of the

52

Fourteenth Amendment, including his right to timely prosecution and caused his confinement and the injuries and damages set forth above.

184.    No reasonable prosecutor or police officer or investigator during the years in question or after would have believed that the Municipal Defendants' acts and omissions in this case — fabricating evidence, coercing false inculpatory statements, failing to document and disclose material, exculpatory evidence, failing to investigate exculpatory evidence or leads pointing toward other more viable suspects and seeking outrageous bond conditions on relatively minor charges — were lawful.

185.    Defendants' intentional, reckless or deliberately indifferent acts and omissions in failing to conduct a constitutionally adequate investigation directly and proximately caused Hall's unfair and malicious prosecution, and deprivation of liberty without due process of law during his nearly four-year ordeal and 570 days of imprisonment, as well as all the ongoing injuries and damages set forth above.

## COUNT III

### 42 U.S.C. § 1983 CLAIM FOR ENGAGING IN CONDUCT THAT SHOCKS THE CONSCIENCE IN VIOLATION OF THE 14th AMENDMENT'S GUARANTEE OF SUBSTANTIVE DUE PROCESS OF LAW

186.    Hall hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

187.    In the Municipal Defendants' collective drive to secure Hall's wrongful conviction, on some charge or any charge, they engaged in arbitrary and conscious-shocking conduct that contravened fundamental canons of decency and fairness and violated Hall's substantive due process rights under the Fourteenth Amendment.

53

188.    Specifically, as set forth above, the Defendants engaged in or used undue suggestion with witnesses in hopes of inducing them to identify Hall as a perpetrator, failed to send important evidence to the crime lab, suborned perjury, covered up their own misconduct, and refused to pursue leads implicating other suspects, all in a concerted effort to justify Hall's arrest, prosecution and conviction although every shred of reliable evidence demonstrated his innocence on all charges.

189.    The Municipal Defendants' conduct shocks the conscience, and violated Hall's clearly established constitutional right to substantive due process of law, as guaranteed by the Fourteenth Amendment. No reasonable investigator and or police officer or prosecutor in 2013 or since would believe the Defendants' conduct was lawful.

190.    Defendants' conscience-shocking conduct directly and proximately caused Hall's arrest, malicious prosecution, and deprivation of liberty without due process of law during his nearly four-year ordeal and 570 days of imprisonment, as well as all of the ongoing injuries and damages set forth above.

## COUNT IV

### 42 U.S.C. § 1983 CIVIL RIGHTS CONSPIRACY CLAIM
### AGAINST ALL NAMED DEFENDANTS

191.    Hall hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

192.    The Municipal Defendants and the Private Defendants, particularly in connection with the False Insurance Charge, agreed or conspired among themselves and with other individuals, officers and supervisors, and others both within and outside of Trimble's office, the City of Williamsburg, Whitely County, Kentucky and the Kentucky State Police, to act in concert in order to deprive Hall of his clearly established Fourth

and Fourteenth Amendment rights not to be deprived of his liberty without due process of law, to the right to a speedy trial, to be free of excess bond or bail, not to be compelled to be a witness against himself, not to be unlawfully seized or falsely imprisoned and fair access to the courts.

193.    In furtherance of the conspiracy to violate Hall's civil rights, the Municipal Defendants together with the Private Defendants and others agreed, engaged in and acted in concert to facilitate and carry out numerous overt acts, including, without limitation, the following:

a.    employing coercion, including physical threats, trickery, deceptive promises, physical brutality and other means deliberately designed to frame Hall for crimes he did not commit or to get him to plead to crimes for which he was not guilty;

b.    providing and utilizing knowingly false information related to the insurance fraud claim as set forth above;

c.    deliberately providing perjured testimony in Hall's grand jury and other proceedings;

d.    before and after Hall's arrests deliberately choosing not to investigate leads pointing to other suspects and corroborating Hall's innocence; among other conduct.

194.    Defendants' conspiracy, and overt acts in furtherance thereof, proximately and directly caused Hall's arrest, malicious prosecution, and deprivation of liberty without due process of law during his nearly four-year ordeal and 570 days of imprisonment, as well as all the ongoing injuries and damages set forth above.

## COUNT V

### 42 U.S.C.  1983 *MONELL* CLAIM
### AGAINST WHITLEY COUNTY, KENTUCKYH AND THE CITY OF
### WILLIAMSBURG FOR UNCONSTITUTIONAL CUSTOMS AND
### PERVASIVE FAILURES TO TRAIN, SUPERVISE AND DISCIPLINE

195.    Hall hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

196.    Before, during, and since the unlawful investigation, prosecution, and confinement of Hall, the Municipal Defendants Whitely County and the City of Williamsburg by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques and prosecutorial techniques by Whitely County and City of Williamsburg officers, prosecutors, investigators and other employees thereof.

197.    Before, during and after the unlawful investigation, prosecution, and confinement of Hall, the Municipal Defendants Whitely County and the City of Williamsburg, by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of failing to adequately train, supervise, and discipline prosecutors, investigators and police officers in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects.

198.    Pursuant to these unconstitutional policies, customs, or patterns and practices, these Municipal Defendants' final policymakers abdicated and effectively delegated to prosecutors acting as investigators along with other untrained investigators and detectives, including but not limited to Defendants Trimble, Bird and Baxter the

56

authority and discretion to conduct and supervise investigations with deliberate and reckless disregard for their constitutional duties and the rights of innocent suspects, including Hall.

199.    As a result, said Municipal Defendants routinely and knowingly engaged in investigative misconduct, and condoned and facilitated the misconduct of subordinates, in a climate of impunity.

200.    The unconstitutional municipal policies, customs, and practices of investigative misconduct and failure to supervise, train and discipline were reflected in the multiple acts of misconduct and illegality committed by multiple investigators and police officers, detectives and supervisors in relation to multiple suspects and witnesses in the Hall investigations and charges, as described above.

201.    These Municipal Defendants' unconstitutional policies, customs, or patterns and practices of investigative misconduct and failure to supervise and train detectives and officers were also reflected in numerous prior cases and investigations involving defendant officers and other employees which, upon information and belief, were known to the Municipal Defendants and their final policymakers before the Hall murder and solicitation to commit murder investigation began.

202.    The misconduct and constitutional violations committed by the individual prosecutors, investigators and police defendants, known and unknown, in the course of the investigation and prosecution of Hall were carried out pursuant to these Municipal Defendants' policies, customs, or patterns and practices of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and their policy, custom, or pattern and practice of failing to train and supervise employee officers,

detectives, and supervisors.

203. Upon information and be1ief, these Municipal Defendants, acting with deliberate indifference, maintained this policy, custom, or pattern and practice of investigative misconduct and policy of failing to train, supervise, discipline, or otherwise remediate investigators and police officers, despite their notice of ongoing lapses of constitutional magnitude and the known or obvious risk that these policies would result in violations of the constitutional rights of criminal suspects like Hall.

204. These Municipal Defendants' policies, customs, or patterns and practices were the moving force in the violation of Hall's constitutional rights, directly resulting in his malicious prosecution, unfair trial, during his nearly four-year ordeal and 570 days of imprisonment, as well as the other grievous and continuing injuries and damages as set forth above.

## COUNT VI

### INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

205. Hall hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

206. Defendants intentionally and/or recklessly, directly and proximately caused Hall, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned, and to suffer physical harm in breach of the duties they owed to Hall by a) hiding or destroying evidence, b) fabricating evidence, c) withholding material, exculpatory and impeachment evidence, d) failing to conduct a constitutionally adequate investigation, e) maliciously prosecuting; and, f) conspiring with individuals such as Wilder and Petrey to impose further confinement or additional false charges, or physical

58

harm upon Hall while incarcerated, and causing Hall's false arrest and imprisonment.

207. The Defendants' actions caused Hall to suffer physical harm, including physical ailments and unauthorized physical contact resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his illegal incarceration.

208. The Defendants' actions caused Hall to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, permanent loss of natural psychological development, ongoing depression and the continued affects of post-traumatic stress disorder.

209. The actions of the Defendants were outside of and contrary to the fundamental norms of society and were extreme and outrageous so as not to be tolerated by a civilized society.

## COUNT VII

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### AGAINST ALL DEFENDANTS

207. Hall hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

208. Defendants directly, proximately, and with negligence and/or gross negligence, caused Hall, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned, in breach of the duties they owed to Hall to refrain from a) destroying evidence, b) fabricating evidence, c) withholding material, exculpatory and impeachment evidence, d) failing to conduct a constitutionally adequate investigation, and e) maliciously prosecuting Hall and causing Hall's false arrest and imprisonment

.

209.    The Defendants' actions caused Hall to reasonably fear for his physical safety throughout the period of his pretrial and post-conviction incarceration.

210.    The Defendants' negligent actions caused Hall to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, permanent loss of natural psychological development, ongoing depression and the continued affects of post-traumatic stress disorder, for which he has sought treatment.

## COUNT VIII

### NEGLIGENCE

211.    Hall hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

212.    The Municipal Defendants and the Private Defendants owed duties of reasonable care in relation to and their handling of the evidence and information used in the investigation and prosecution of Hall on the charges set forth above, specifically to insure, to the extent possible, that all evidence submitted to the Municipal Defendants by the Private Defendants, or developed by Private Defendants and used by the Municipal Defendants in the prosecution of one or more of the bogus charges identified above was reliable evidence.

213.    Nonetheless, the Municipal Defendants and the Private Defendants were negligent and/or grossly negligent in the development, submission and use of evidence, in particular the evidence developed in connection with the Fraudulent Insurance Charge, for the reasons specified above.

214.    Defendants' negligent acts resulted in the arrest and imprisonment of Hall on at least one or more charges without probable cause or other legal justification, where in fact Hall was innocent of any crime,

215.    The Municipal Defendants and the Private Defendants knew of or had reason to know that their negligent acts would result in the wrongful arrest and imprisonment of citizens such as Hall.

216.    At all relevant times the Municipal Defendants, in connection with their negligence, violated ministerial duties imposed upon them by fixed rules and applicable law.

217.    As a direct and proximate result of this negligent acts of the Defendants as hereinabove outlined and alleged. Hall was wrongly arrested, prosecuted, and imprisoned, and sustained the injuries and damages set forth in this Complaint.

## COUNT IX

### NEGLIGENT HIRING AND SUPERVISION AGAINST VERACITY AND USAA

218.    Hall hereby incorporates by reference all of the forgoing paragraphs and further alleges as follows:

219.    Veracity and/or USAA failed to conduct any kind of due and sufficient background check on Wilder prior to hiring him or contracting with him or each other in connection with the investigation and prosecution of the Fraudulent Insurance Claim.

220.    Wilder, prior to the events identified in this Complaint had been terminated by various police and other law enforcement agencies and sued for assault, malicious prosecution, and violation of the rules and regulations governing his conduct as a law enforcement officer. This information was public record or readily available to

Veracity and/or USAA.

221.    Veracity and USAA had a duty to properly verify Wilder's credentials and suitability to serve in the capacity as a private investigator for or on behalf of Veracity and USAA prior to hiring or engaging him and empowering him on behalf of their respective organizations.

222.    The failure of Veracity and USAA to comply with this duty, and their evident disregard for Wilder's history of illegal conduct and abuse resulted in part, or furthered or facilitated the wrongful and malicious prosecution of Hall and the wrongful confinement of Hall on the Fraudulent Insurance charge, among other damages.

223.    Veracity and USAA acted with callous disregard or otherwise acted intentionally, fraudulently, oppressively or with gross recklessness in employing or engaging or otherwise empowering a man with Wilders' notorious background to serve as an investigator on their behalves, entitling Hall to punitive damages.

## COUNT X

## DEFAMATION

224.    Hall hereby incorporates by reference all of the forgoing paragraphs and further alleges as follows:

225.    As set forth above the Defendants made knowing false statements about Hall to the media and/or which were then obtained by the media and widely reported, including but not limited to that Hall had committed "murder" and was guilty of other charges as set forth above.

226.     Those false statements constituted defamatory language which was published in one or more prominent newspapers or television broadcasts (along with

62

other publications) which caused severe and irreparable injury to Hall's reputation.

227.    The type of defamatory language constitutes defamation *per se* as it involved knowingly false statements that Hall had committed one or more heinous crimes.

228.    In making the defamatory statements, Defendants jointly or severally acted with callous disregard or otherwise acted intentionally, fraudulently, oppressively or with gross recklessness entitling Hall to punitive damages.

## COUNT XI

### FALSE IMPRISONMENT UNDER STATE LAW

229.    Hall hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

230.    The conduct of the Municipal and Private Defendants as set forth above resulted in the deprivation of Hall's liberty as well as his actual confinement within boundaries not of the Plaintiff's choosing,

231.    The conduct of the Defendants as set forth above was the actual cause of said confinement.

232.    The Defendants knew that their conduct would result in Hall's unlawful confinement.

233.    Hall suffered those damages as a result of said confinement set forth above.

## COUNT XII

## RESPONDEAT SUPERIOR

234.    Hall hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

235.    At all times relevant to this Complaint, the Municipal and Private Defendants or entities acted through their employees or agents and servants who were then acting within the scope of their employment. The conduct by which the Defendants committed the torts of malicious prosecution, false arrest and imprisonment, intentional or reckless infliction of emotional distress and negligent infliction of emotional distress, negligence and defamation, as set forth above in the above Counts was undertaken while the Defendants were carrying out their routine investigative functions as investigators and police officers, or as private companies, while Defendants were subject to their employer's control and engaging in such conduct as would have been reasonably expected, and was in fact foreseen by their employer. In undertaking this conduct, Defendants intended to further the law enforcement goals of Whitely County, the City of Williamsburg and the Kentucky State Police as well as their own individual private interests.

236.    The City of Williamsburg, Kentucky, Veracity, and USAA are liable for all damages caused by their respective employees and agents' actions leading to Hall's damages from any of the tort claims identified above under the doctrine of *respondent superior.*

**WHERFORE,** Hall by counsel prays for the following relief:

A.      That the Court award actual, compensatory, special, hedonic and statutory damages (as well as all other damages to which he may be entitled at law) to him and against the Municipal and Private Defendants, jointly and severally, in an amount to be determined at trial;

B.      That the Court award punitive damages to him, and against all appropriate Defendants, on the basis of their grossly reckless, intentional, malicious, fraudulent or oppressive conduct as set forth above, in an amount, to be determined at trial, and that will deter such conduct by Defendants in the future;

C.       For a trial by jury on all issues so triable;

D.      For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims and costs pursuant to 42 U.S.C. § 1920 or other applicable law; and,

E.      For any and all other relief to which he may be entitled including the right to amend this Complaint.

Respectfully submitted,

**COOPER & FRIEDMAN, PLLC**

/s/ Hal D. Friedman
HAL D. FRIEDMAN
MICHAEL T. COOPER
1448 Gardiner Lane
Suites 301-303
Louisville, Kentucky 40213
(502) 459-7555; fax (502) 451-1698
hdf@cooperandfriedman.com
mtc@cooperandfriedman.com
*Counsel for Plaintiff*

65